FETTER et al. *v.* FIELD et al.

Plaintiffs having sold certain merchandize to defendants for cash, on the failure of the latter to pay the price, commenced an action against them, within eight days from the date of the sale, to recover the price, with a privilege as vendors upon the property or its proceeds. The property, which had been shipped, was sequestered. A creditor of the defendants, to whom bills of exchange drawn upon the shipment had been sold, and to whom the bills of lading had been endorsed and delivered previously to the commencement of the action, intervened, claiming the property. It was proved, that the defendants were in bad credit at the time that the bills of exchange were sold to the intervenor, who took them in payment of a pre-existing debt, paying the defendants the difference between their amount and that of the debt due to him; that, according to the course of trade in the place where the transaction occurred, bills of exchange drawn on a particular shipment, accompanied by the bills of lading, usually represent the price of the property sold, or the means of re-imbursing the price to some party; and that the intervenor had reasonable grounds to believe that the bills of lading received by him were for property which defendants had no right, at that time, to give in payment for a pre-existing debt, without violating the rights of some other person. *Held,* that, under the circumstances, the privilege of the vendors must prevail against the claims of the intervenor.

Notice to an agent is notice to the principal.

Defendants having purchased certain merchandize in New Orleans, shipped it, and consigned it to the intervenors in New York, on whom they drew for the amount of the shipment. Subsequently to the depositing of the bill of lading in the post office directed to the consignees in whose favor it was made, but before its receipt by the latter, and before the bills of exchange drawn upon the shipment had been accepted, plaintiffs, on the failure of defendants to pay the price, and within eight days from the day of sale, commenced an action for the purpose of asserting their privilege as vendors, and sequestered the property. The consignees intervened, claiming the property. It was proved that the intervenors had paid the bills drawn on the shipment, and that they were not privy to the transactions between the defendants and their vendors. *Held,* that, after shipment, the property was held by the carrier for the lawful holder of the bill of lading; that, by depositing the bill of lading in the post office, defendants parted with all control over it, and cannot be considered as having been in possession of the merchandize after that event; that, whether the possession be held to have been in abeyance during the transmission of the bill of lading by mail, or the rights of the consignees on the receipt of the bill of lading be considered as referring back to the time of depositing the letter, can make no difference as to the plaintiffs, who, under art. 3194 of the Civil Code, can claim a preference on the price of the property only while it remains in the possession of the purchaser; and that, the transaction between the defendants and intervenors having been according to the usual course of trade, and in other respects unimpeached, there must be judgment for the latter.

APPEAL from the District Court of the First District, *Buchanan,* J.

*Mott,* for the plaintiffs. A seizure of property made by a creditor of the shipper, previously to the receipt of the bills of lading by the consignee, will be maintained. 1 La. 359. 12 La. 147. 13 La. 490. Bullard & Curry's Digest, 165. Civil Code, art. 3214. 5 Maule and Selwyn, 349. 3 Durnf. and East. 119. 4 Espinasse, 82.

*Grymes,* on the same side. *C. M. Randall,* for the defendants.

*Wharton, Benjamin* and *Micou,* for the appellants, *Corning & Co.* The endorsement of a bill of lading, for a valuable consideration, to a *bonâ fide* third party, vests a qualified property in the transferee at the instant of the endorsement. Abbott on Shipping, (Lond. edit. 1844,) 333, 532, 534–5. 3 Chitty's Commercial Law, 405. 3 Kent's Commentaries, 207. *Nathan v. Giles,* 5 Taunton, 558. 1 Peters, 386, 445. Cross on Lien and Stoppage *in transitu,*

p. 252-3, in 34th vol. Law Library.   See also 1 Smith's Leading Cases, pp. 388, 435.   *Haile* v. *Smith*, 1 Bosanquet & Puller, 571.   *Evans* v. *Nicholl*, Comm. Law Reports, vol. 42, p. 325.   *Bryan* v. *Hill*, 3 Meeson & Welby. *Stanton* v. *Euger*, 16 Pickering, 467.   Under such circumstances' the vendor's lien must yield to the claim of the endorsee of the bill of lading.   *Erwin* v. *Torrey*, 8 Martin, 90.   3 Chitty Commercial Law, 405.   1 Campbell, 104, 180, b. A pre-existing debt is a valuable consideration, in the usual course of trade, for the assignment of a negotiable instrument.   *Swift* v. *Tyson*, 16 Peters, 1.

*T. A. Clarke*, for the appellants, *Davis, Brooks & Co.*   A *bonâ fide* transfer of a bill of lading conveys the property.   2 Kent's Comm. 499, 549.   Abbott on Shipping, 369, 373.   9 Martin, 90.   The purchasers having lost all control over the property by the transfer of the bill of lading, their vendors had no longer any privilege thereon.   4 Mart. N. S. 688.   7 Ibid. N. S. 139.

The judgment of the court was pronounced by

EUSTIS, C. J.   In May, 1844, the plaintiffs sold to the defendants a quantity of corn and hemp for the sum of $5,572, for cash.   It was delivered, but not paid for, and, *within the eight days*, the plaintiffs had it sequestered for the payment of the price, and brought suit for the enforcement of their privilege as vendors.

*Corning & Co.* have intervened in this suit, and claim two thousand six hundred and seven sacks of the corn, which they allege to have been shipped on board the brig Ohio, and for which they hold the bills of lading.   They allege that the defendants had shipped the corn to New York, and drew on the shipment; that they, the intervenors, purchased from the defendants the bills of exchange; that the bills of lading were regularly transferred to them; and that both were forwarded by them by mail, to New York, the place of destination of the shipment, before the service of the sequestration of the plaintiffs.

It appears that *Corning & Co.* were the agents of *J. A. Knox* in this business, by whom the bills of exchange were purchased.

It is proved, that the bills of exchange were drawn on this shipment, and that the bills of lading accompanying them were endorsed and delivered to the interveners, whose rights were complete, as the holders of the bills of exchange and bills of lading, previously to the suit of the plaintiffs, and we have to consider them in opposition to the plaintiffs' privilege as vendors.

At the time of their suit, the property was no longer in the possession of the purchasers.   It had been delivered on board ship, the bills of lading were in possession of the intervenors, and the defendants had no longer any control over it.

The intervenors do not rest their rights on the change of possession, but set forth its cause and origin, and claim the ownership, for the purpose of the application of the proceeds of the shipment to the payment of the bills of exchange specifically drawn upon it.   The mere question of possession is merged, therefore, in that of ownership, and we must proceed to investigate the claims in that respect.

On the 20th of April, 1844, *Knox* purchased from *Willis*, a broker, two bills of exchange, amounting to $5,800, drawn by the defendants on *Benj. H. Field*, in New York.   These bills were protested for non-acceptance, and *Knox* was apprised of this on the 8th of May ensuing.   He sent for *Willis*, and, not being able to go out himself, directed him to see *Field*, and ascertain what arrangement he was disposed to make about the bills which were in sufferance.   It

FETTER
*v.*
FIELD.

must be observed, that *Field*, the son, then in charge of the business of this house, was a youth of nineteen. *Willis* called, repeatedly on *Field* that day, the 8th, but could not find him until the next day, the 9th, when he said he had heard of the fate of the bills. On being asked to give security for the payment of the bills at maturity, he refused, and said he would pay the bills here that day or the next day, by giving a bank check for the amount. He kept promising from day to day until Saturday, the 11th, when he assured *Willis* that he would settle on Monday. *Willis* asked him what grounds he had to think he would do so. He replied, that he expected to sell some exchange; that owing to his credit being impaired, he had not thus far been able to sell any. *Willis* says: " He asked me, if I could sell some exchange for him with bills of lading? I said I would try. He then gave me three bills for $2,200 each, with bills of lading. From a memorandum given me, I found the bills were drawn for the full value of the produce shipped, and I saw it would be difficult to place them in that way. Before three o'clock, I returned to *Mr. Field's* counting room, told him the bills were not sold, and gave them back to him with the bills of lading. After having done so, I told him that as he intended to settle with *Knox* with the proceeds of exchange on New York, he might as well let me take back again the same exchange which I had just returned, and which was then on his desk, and authorize me to pay *Knox* out of the proceeds, if I could sell them to any one else, and, in case I could not do so, sell them to *Knox* himself, and let him deduct the amount of the bills on *Benj. H. Field*, noted for non-acceptance. After some reflection, he said: Very well, I will do it. I asked him, then, to endorse the bills of lading, which he did, and handed them to me with the bills. In the afternoon I took the bills to *Knox*, who offered me a check for the difference. It being after bank hours, I told him I would call early on Monday. I did so the first thing in the morning, and immediately went to *Field*, and paid the money that was coming to him. At the same time, I handed him an account, which he said was correct, and receipted it."

*Willis* adds: " When I made the arrangement on Saturday with *Field*, I had no knowledge whatever of the nature of the engagements of his house, nor did I know or suspect that the produce for which he gave me bills of lading was not paid for. He told me he wanted four thousand dollars to pay that day, but I thought that the debt he wanted to pay was of the same nature as *Knox's*. I saw *Depeyster* repeatedly at *Field's* on Saturday, and I saw him finally take away some bill or bills of lading, and, having heard of his being intimate with *Field*, I imagined that it was a settlement for borrowed money. I must further say that, after I had paid over to *Field* the balance due him on the bills on *Davis & Brooks*, I offered to bring him an order for the dishonored bills on *Benj. H. Field*, and told him he might have them whenever he called for it. These bills subsequently came back from New York, and I tendered them to *Field*, but he refused to receive them."

*Willis* was a witness offered by the intervenors, and, determining the case on his testimony, we have come to the conclusion that *Corning & Co.* did not acquire this shipment in the usual course of business, and that their possession and ownership is not of that character which will prevail against the lien of the vendor. Our opinion is based upon a consideration of the following facts:

1. According to the course of trade in this city, the bill of exchange drawn on a particular shipment, accompanied by the bill of lading, usually represents the

price of property sold, or the means of re-imbursement of the price to some party.

2. The house of *Field & Son* was embarrassed at the time of the transactions before mentioned. The bills held by *Knox* were already under protest in New York. *Willis* thought the $4,000 debt mentioned by *Field*, was one of the same character. *Field* told him that, in consequence of the credit of the house being impaired, he could not sell his exchange. His delays in arranging at once for the bills of exchange held by *Knox*, and the impressions produced on *Willis'* mind by *Depeyster's* visits, were co-incident circumstances pointing to the same result, and were abundantly sufficient to put any prudent, right-minded person, upon his guard in his dealings with the house.

3. *Field*, the son, was a youth of nineteen. His father was absent in New York, and the son was entrusted with the business of the house. Of itself, this fact would have little weight under ordinary circumstances, but, coupled with those attendant on this case, we cannot withhold the impression that, under the trials to which he was subjected in the difficult and embarrassing position in which he was placed, his youth ought to have excited greater circumspection from those who were dealing with him.

There are some other facts which we have not noticed, because they all confirm the opinion which we have, after great consideration, adopted—that the state of things was such, that the intervenors had reasonable grounds to believe that the bills of lading which they received were for property which *Field & Son* were not at liberty to give in payment, at that time, for a pre-existing debt, without violating the rights of some other person.

We consider *Willis* as the agent of *Knox*, for the collection of the protested bills from *Field & Son*, and that notice to him was notice to *Knox*.

*Davis & Brooks*, merchants in New York, claim two thousand sacks of this corn. They were the factors and correspondents of the defendants, and are the holders of the bill of lading of the shipment which was made in their favor, and received by them in New York, on the 16th May, 1844.* They accepted and paid bills of the defendant's drawn on this and other shipments, without any privity as to the transactions in New Orleans. Every thing connected with this shipment and the bills, appears to be regular and according to strict mercantile usage, so far as they are concerned.

The only question in relation to this shipment is, whether the non-receipt of the bill of lading in New York by the consignees previous to the sequestration of the plaintiff, and the fact of the bills of exchange being accepted subsequently to that date, are facts which prevent the intervenors from acquiring rights on the property paramount to the privilege of the vendors.

Was the property sold by the plaintiffs in the possession of the defendants at the time of the attempt to enforce the vendors' privilege ?

It was on shipboard under a bill of lading. It was in the possession of the carrier, who possessed it for the lawful holder of the bill of lading, who had the only symbol of ownership, and had the sole control of it, and the sole power of disposing of it. By putting the bill of lading in the post-office, the defendants parted with all control over it, for they addressed it to the consignees in whose favor the bill was made, and on whose signature the shipment was to be delivered. In no sense could the defendants be considered as being *in the possession of*

---

* This action was commenced on the 13th May, 1844.

FETTER
v.
FIELD.

the property after the shipment and transmission of the bill of lading towards its destination. It will be observed that our enquiry here is confined to the fact of possession, and the change of possession, according to the usual course of business. This is not the case of an attaching creditor, but of a vendor who sues to enforce his privilege, and a party relying upon his rights growing out of the fact of the purchaser having parted with his possession. When the shipment was made, and the shipper received his bill of lading in favor of the consignee, and put it in the post-office for transmission, as he was no longer in possession of the property, the civil possession must either be held to be in abeyance during the transmission by mail, or the right of the consignee, on the recept of the bill of lading, must be considered as referring back to the deposit of the letter in the post-office in New Orleans, neither of which hypotheses would benefit the plaintiffs, whose rights are based upon and limited to the provisions of this article of the code : "He who has sold to another any moveable property, which is not paid for, has a preference on the price of this property, *over the other creditors* of the purchaser, whether the sale was made on a credit or without, *if the property still remains in the possession of the purchaser*." Art. 3194.

This article provides for the exercise of the privilege only in the case of the property sold being in the *possession of the purchaser*, and appears to contemplate the conflicting claims of other creditors as opposed to the rights of the vendor, and not of those who base their claims on a want of possession in the vendee, or an adverse possession. Article 3196 is to the same effect. We have examined the jurisprudence of France as to the similar privilege allowed by the Napoleon Code, and can find no case in which it has been extended beyond the limitation which we consider to be imposed by article 3194. *Vide* also *Laughlin* v. *Ganahl.* 11 Robinson, 143. It is impossible to overlook the fact, that contracts are made on bills of lading which are retrospective in their operation and relate back to the time of shipment, and that as to a change of possession, operated by the shipment and parting with the bill of lading by endorsement, and effecting the delivery as far as in the nature of things a delivery can be effected, there can be but one opinion. Under a state of facts like this, where any rights are acquired in relation to the change of possession, it is our duty to give effect to them whenever the usages of commerce are observed, and the transaction is, in other respects, regular and unimpeached.

It is, therefore, ordered that the judgment of the District Court* be affirmed, except so far as relates to *Davis, Brooks & Co.* ; and it is further ordered that the intervenors, *Davis, Brooks & Co.*, recover from the plaintiffs, *Fetter, Lonsdale & Gray, in solido*, the sum of $1900, and the costs of this appeal and of the court below.

---

* The judgment below was in favor of the plaintiffs.